FILED
90 SEP 15 PM 3: 24
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ISIAH HOUSTON, JR., | } |
| Plaintiff, | } |
| v. | } CIVIL ACTION NO. |
| | } 98-AR-1875-S |
| JIM WALTER RESOURCES, | } |
| Defendant. | } |

ENTERED
SEP 15 1999

## MEMORANDUM OPINION

Presently before the court is a motion for summary judgment filed by defendant, Jim Walter Resources ("JWR"). The motion seeks judgment as a matter of law on claimed violations of 42 U.S.C. §§ 2000e *et seq.*, Title VII of the Civil Rights Act of 1964, *as amended* ("Title VII"); and 42 U.S.C. § 1981. For the reasons set forth herein, the motion is due to be granted.

### Pertinent Facts

Isiah Houston ("Houston"), an African American and a member of the United Mine Workers of America, was employed by JWR from 1985 to 1997. Houston was terminated on September 23, 1997, allegedly for violating JWR's work rules number seven (fighting, threatening, and intimidating other employees) and number thirteen (wasting

1



time, loafing, and neglect of job duties).

On April 2, 1997, when Houston arrived at work, his supervisor, Jack Winfree ("Winfree"), a Caucasian, assigned him his duties for that evening. Houston worked the "owl" shift from 11:00 p.m. to 7:00 a.m., and was assigned the task that night of sweeping down a certain isolated area of the mine.

Winfree says that during the shift that evening, as he was making his inspection rounds, he observed that Houston was making unacceptably slow progress sweeping in his assigned area. Winfree cautioned him about his work progress. Winfree further claims that because Houston had previously been counseled over performance issues, Winfree followed up again later that evening during the shift to see if Houston had, in fact, heeded his caution.

Winfree alleges that when he returned, he observed Houston sitting down for about five minutes. When he approached Houston to discuss the work performance issues a second time, Winfree alleges that Houston exploded. Winfree claims that Houston, a man of about 300 pounds to Winfree's 200, crossed his arms in front of his body and lunged against Winfree, knocking him to the ground. Winfree further claims that Houston held Winfree's arms and in the process tore off his wristwatch, that Houston struck him repeatedly, bit his finger, threatened to gouge out his eyes and to kill him and

2

his family, and then hit and scraped Winfree's forehead and the top of his head with a pair of steel channel locks.[1] Winfree claims that this attack only ended after he pleaded with Houston for about five minutes to let him go. This all happened below ground in the mine.

The parties agree that immediately after emerging from the mine, Winfree called his supervisor, John Puckett ("Puckett"), to inform him of what allegedly occurred. Winfree recommended against sending mine personnel down to get Houston, explaining to Puckett that it might be safer to wait until Houston emerged from the mine after his shift, because Houston was agitated and possibly dangerous.

After Winfree spoke to Puckett, Winfree called Rayford Kelley ("Kelley"), the Industrial Relations Manager, at home to report the incident. Winfree returned to the mine to complete his inspections, and when he emerged at 5:30 a.m., Winfree saw Kelley. Kelley, who knew Winfree for five years, noticed that Winfree was "not himself" and "noticeably shook." Later, Winfree met with Chuck Stewart ("Stewart"), the Mine Manager and ultimate decision maker with respect to Houston's termination. Stewart took pictures

---

[1] Channel locks are a tool similar to pliers.

of the abrasions on Winfree's head and face.

When Houston emerged from the mine, he was met by John Wallace, a Union Representative.  Wallace informed Houston that Kelley and Tommy Stewart, an African-American manager, wanted to meet with Houston.  When Houston was informed at this meeting of Winfree's allegations of physical attack and threats, Houston denied the charges completely.

After this meeting with Tommy Stewart and Kelley, Houston was suspended with intent to discharge.  Next, pursuant to the terms of the collective bargaining agreement, JWR met with Houston to discuss the allegations, but did not lift the suspension after this meeting.

Houston filed a grievance alleging that he did not assault Winfree.  When this grievance reached arbitration, Puckett testified that he did not see any marks on Winfree at the start of the shift on the night in question, and confirmed Kelley's testimony that Winfree was upset and shaken after the alleged incident.  The arbitrator denied Houston's grievance, and JWR terminated Houston on September 23, 1997.

It is this termination that is the subject of Houston's current complaint in this court against JWR, charging racially discriminatory motivation for its adverse employment decision.

4

## Discussion

Houston makes two analytically distinct arguments in opposition to JWR's motion for summary judgment. First, Houston argues that even if the attack happened exactly as Winfree claims, Houston was punished more severely than other, similarly situated Caucasian employees involved in fighting. Second, Houston argues that there was no attack at all of any kind, and that JWR had no reasonable basis for believing that there was; and, furthermore, the mere fact that JWR accepted Winfree's "preposterous" account of this alleged fight demonstrates, in and of itself, that JWR's stated reason for terminating Houston was a pretext for race discrimination.

In considering Houston's arguments, the court finds that the traditional *McDonnell Douglas* burden shifting analysis is somewhat inadequate. This is because, ordinarily, a court only considers "pretext" if and when the plaintiff first makes out his *prima facie* case of discrimination. Here, as the discussion below will explain, Houston has not presented evidence tending to prove that he was treated less favorably than similarly situated Caucasian employees. Thus, he does not make out a *prima facie* case of discrimination, and the court could stop here and grant

summary judgment for the defendant.

The court, however, is reluctant to stop here. Houston's inability to show disparate treatment when compared to others involved in fighting should not form a basis for rejecting his claim if JWR had no reasonable basis in the first place for believing that Houston was involved in a fight. Accordingly, although it does not fit conveniently into the traditional test, this court will look past Houston's failure to make his *prima facie* case and examine his second argument.[2]

The court begins by examining Houston's dependence upon *McDonnell Douglas*. Houston can establish a *prima facie* case of race discrimination under *McDonnell Douglas* by showing: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably;[3] and (4) he was

---

[2] As the Supreme Court explained: "The *prima facie* case method established in *McDonnell Douglas* was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482 (1983) (internal citations and quotation marks omitted).

[3] As the Eleventh Circuit explained: "In determining whether employees are similarly situated for purposes of establishing a

6

qualified to do the job. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824- 25 (1973).[4]

Elements one and two are not at issue. Element three, however, is very much at issue. Houston describes four incidents that he claims demonstrate that similarly situated white employees received more favorable treatment.

First, Houston points to an altercation between George Hocutt ("Hocutt") and Phillip Edwards ("Edwards"). Houston concedes that this incident, apparently a shouting match, did not involve physical contact. Houston argues that the incident can still be used for comparison because JWR's work rule seven applies to all "threatening, fighting, and intimidating," and that work rule seven does not distinguish among degrees of severity.

The court disagrees. Work rule seven, as Houston himself

---

*prima facie* case . . . [t]he most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed. **We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.**" *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)(emphasis added) (internal quotations and citations omitted).

[4] The test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 2377-78 (1989).

7

points out, subjects violators to "disciplinary action **up to** and including discharge"(emphasis added). This wording leads inescapably to the conclusion that lesser penalties will ordinarily be imposed for lesser offenses, thereby distinguishing among degrees of severity. Houston is apparently arguing that if one man is discharged for beating his supervisor with a steel tool, the next man who violates rule seven, even though all he did is to engage in a shouting match, must also discharged. The court does not agree and finds that the Hocutt/Edwards incident described above does not provide a reasonable comparator.

Next, Houston offers what he claims to be a comparable incident through the declaration of Lester Barnes ("Barnes"), in which Barnes alleges that he, who is white, had a physical altercation with Hocutt, who is also white. Barnes testifies that Hocutt repeatedly "pushed, shoved, and poked" Barnes, and raised his fist as if to threaten Barnes, and that neither white employee was terminated.

The court does not agree with Houston that a pushing, shoving and poking incident is "nearly identical" to an incident during which a 300 pound employee pinned down his supervisor for five minutes in an isolated part of a mine, repeatedly struck him, threatened his life and the life of his family, threatened to gouge

8

out his eyes, and raked him several times over his head and forehead with a steel tool. Moreover, even if Houston were able to demonstrate similarity between the two events, that alone is not enough. Houston can only show unfairness if he can show that similarly situated employees were treated differently by the <u>same decision makers</u>,[5] and that these decision makers were aware of all relevant comparator incidents.[6]

Here, Barnes, in his declaration, offers no evidence that the decision makers involved in Houston's termination knew of the alleged Barnes/Hocutt altercation. Barnes states that he "reported the altercation to management," but he fails to say who in management received this report. Different supervisors may have different management styles. One may be stricter than another. Assuming, *arguendo*, that the treatment was disparate, difference in style may be the explanation, and such disparate treatment is not forbidden because it is not based on race.[7]

Not only is pushing, shoving and poking not legitimately

---

[5] *See Jones v. Gerwens*, 874 F.2d 1534, 1541-42 (11th Cir.1989).

[6] Here, Kelley and Stewart, the decision makers in Houston's termination, testified that at the time of Houston's termination they did not know of this incident.

[7] *Jones*, 874 F.2d at 1541-42.

comparable in severity to the alleged attack by Houston, but Houston offers no evidence to suggest that the decision makers in his termination were aware of the earlier occurrence. Accordingly, the alleged Barnes/Hocutt altercation cannot serve as a reasonable comparator incident.

Third, Houston offers the declaration of Kenneth R. Clements ("Clements"), who was the local union officer when the incident between Houston and Winfree occurred. Clements offers as a comparator an alleged physical altercation between "Bones" Bailey ("Bailey") and his supervisor, Monte Montgomery ("Montgomery"), after which neither of these white employees was terminated. Again, the court is not convinced that a "physical altercation" between two employees is comparable to the type of terrifying, one-sided assault alleged in this case. But even if these incidents could be described as "similar" in that sense, Clements again makes no claim that the decision-making supervisors in this case were aware of this alleged altercation between Bailey and Montgomery. Instead, he states that the hearings into the matter were "confidential." Again, for the same reasons discussed above, the incident described in Clements' declaration is not a reasonable comparator.

Finally, Houston offers the declaration of Harold "Chico" Ware

10

("Ware"), who states that he was involved in a physical altercation with his supervisor, that both are white, and that neither was terminated. Although Ware does not explain what he means by the description "physical altercation," Houston, in his deposition, described this incident as one involving hair pulling. Here again, the court finds that a hair-pulling incident is not comparable to the one alleged in this case and, therefore, that any lesser punishment, if any, meted out was justified by the lesser offense. Again, there is no evidence in this case either that the decision-making supervisors were aware of the incident. Thus, the incident described in Ware's declaration, like those of Barnes and Clements, is not a reasonable comparator.[8]

Taking all inferences permissible on these facts in favor of Houston, this court sees no evidence from which a reasonable jury could conclude that JWR treated Houston less favorably than similarly situated white employees. Accordingly, Houston has failed to establish a *prima facie* case of disparate treatment based on race.

---

[8] The parties have devoted considerable attention to the question whether the declarations of Barnes, Clements, and Ware should be struck in whole or in part. This court finds, however, for the reasons discussed above, that even if the declarations are accepted in their entirety, they are of no consequence. Accordingly, this court finds that the motion to strike the declarations of Barnes, Clements and Ware is moot.

11

Notwithstanding this failure, and for the reasons explained at the beginning of this discussion, the court will examine Houston's alternative argument.

Houston next argues that Winfree's version of what happened on the night in question is so preposterous that the mere fact that JWR chose to believe Winfree's story demonstrates that JWR's stated reason for terminating Houston was a pretext for race discrimination.

In arguing that Winfree's report was not credible, Houston makes several points. First, Houston alleges that Winfree is not worthy of belief because he changed his story "dramatically" between his first description of the events shortly after the incident occurred, as compared to the description he gave in his deposition in preparation for this lawsuit. Next, Houston claims that Winfree's injuries were not as severe as they would have been had the attack actually occurred as Winfree claims. Finally, Houston argues that if this "savage" attack had actually occurred as claimed, Winfree would never have finished out his own shift or, for that matter, left Houston in the mine to finish his shift without having Houston removed by the police or by mine security personnel.

First, with respect to the alleged inconsistencies in

12

Winfree's description of the events, they are not relevant to the a question of JWR's reasonableness in accepting Winfree's version when it occurred. JWR was not in possession of Winfree's later deposition testimony to compare at the time it made the decision to terminate Houston. After examining the record the court doubts that the inconsistencies Houston claims are anything more than minor and inconsequential. Even if the inconsistencies were major, however, they are irrelevant. JWR could not have known what these future inconsistencies might have been. Therefore, they cannot bear on the reasonableness of JWR's decision to accept Winfree's version of events at the time of Houston's termination.

Next, Houston claims that Winfree's injuries would have been more severe had the attack actually occurred as Winfree described it. The court does not agree. Winfree was observed going into the mine at the beginning of the shift with no injuries at all. Coming out, he was observed with contusions and abrasions on his face and head. These abrasions were photographed and appear plainly visible in those photographs, and they are consistent with Winfree's version of the alleged attack. Additionally, Winfree's treating physician diagnosed Winfree with multiple contusions and second degree assault. Of course, it is possible that more serious injuries might also have been consistent with Winfree's version of

the events. The injuries Winfree did suffer, however, were consistent with his description, and they provide no basis for calling into question JWR's reasonableness in believing Winfree's account.

Finally, Houston argues that no man who had been through that type of "savage" assault would have (a) finished his shift, or (b) allowed the attacker to finish his shift. The court disagrees. Winfree's job at the time of the alleged attack was as a beltline inspector, which included responsibilities involving the safety of his fellow miners. Mining, of course, is a dangerous occupation. This court believes that Winfree could well have felt compelled to see the shift through to the end with the safety of his fellow miners at stake.

With respect to allowing Houston to finish his shift, Winfree explained that he thought it would be safest to allow Houston to emerge on his own, given Houston's agitated state at the time. Again, this explanation seems entirely plausible, especially in view of Houston's 300-pound frame.

### Conclusion

Based on the discussion above, this court finds that Houston has introduced no evidence creating a genuine issue of material fact with respect to whether he was treated less favorably than

similarly situated white individuals.  In addition, Houston has introduced no evidence creating a genuine issue of material fact with respect to whether Winfree's version of events was so inherently unbelievable that JWR's acceptance of it demonstrates that JWR's stated reason for terminating Houston was a pretext for race discrimination.  Accordingly, judgment as a matter of law for JWR is due to be granted.  An appropriate order will be separately entered.

DONE this 15th day of September, 1999.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE